IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KURT CHADWELL, Individually and as a Personal
Representative of the Estate of Decedent E.E. Chadwell,

       Plaintiff,

v.                                    Case No.  20-1372-JWB

UNITED STATES OF AMERICA,

       Defendant.

**MEMORANDUM DECISION**

This is a medical negligence action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1). Following a stroke in the second half of 2013, Earl Chadwell ("Earl" or "the Decedent") sought treatment at the Veterans Affairs Medical Center ("VAMC") in Wichita, Kansas. Earl died on August 17, 2014. Earl had two sons, Plaintiff Kurt Chadwell ("Plaintiff" or "Kurt") and Mark Chadwell ("Mark"). Plaintiff is the sole administrator of the estate of the Decedent; he is also the sole heir and beneficiary of the estate after Mark disclaimed his interest in the estate. (Doc. 425 at 1.) Plaintiff filed an administrative claim with the Veterans Administration ("VA").

On December 31, 2020, Plaintiff filed a complaint against Defendant United States of America asserting a survival claim under K.S.A. § 60-1801 on behalf of the estate and a wrongful death claim under K.S.A. § 60-1901 on his own behalf as an heir. (Doc. 1.) On April 21, 2025, the court dismissed the wrongful death claim for lack of jurisdiction. (Doc. 425.) This court has subject matter jurisdiction over the remaining survival claim pursuant to 28 U.S.C. § 1331. The court presided over a bench trial from May 6–15, 2025, and took the matter under advisement. The court has thoroughly considered the evidence and arguments presented at trial, the parties'

1

post-trial submissions,[1] the transcripts and deposition designations, and the relevant law, and makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

For the reasons discussed herein, the court enters judgment for Plaintiff and against Defendant on Plaintiff's remaining survival claim.

## I.     Findings of Facts

The following sets forth the facts found material to the issues determined by the court. Where appropriate, additional facts found by the court are discussed in the subsequent section on the conclusions of law.

On October 13, 2013, Earl, who was 89 years old, suffered a right cerebral stroke (or cerebrovascular accident ("CVA")) and was treated at Wesley Medical Center and Wesley Rehabilitation. (Ex. 228.) At the time of admission, Earl was diagnosed with acute stroke, subdural hematoma, and other injuries related to a fall. (Ex. 824.) Earl had carotid artery disease and a 70% stenosis in his proximal right carotid artery. (*Id.*) Although surgery was typically recommended due to blockage, his family decided to forgo surgery because of the increased risks due to Earl's age and condition. (Tr. 1685:5–1686:7.) Earl was discharged from Wesley on October 18 to the Wesley Rehabilitation Center. On October 21, 2013, Earl fell from the toilet at Wesley Rehabilitation Center. He again went to Welsey Medical Center. (Ex. 826.) In addition to the CVA and his injuries related to his fall, Earl had a significant number of other medical conditions at this time. He had hypertension, prostate cancer (which was responding well to treatment), chronic kidney disease, hyperglycemia, chronic anemia, dysphagia, chronic pain,

---

[1] Plaintiff asserts that this court's page limitation on the parties' proposed findings of facts and conclusions of law has prevented him from including all material facts and the necessary citations to the record. (Doc. 478 at 1, n.1.) The court's page limitation was reasonable in light of the issues in this matter and, in any event, the court has reviewed the record in this case in making its findings herein.

congestive heart failure, coronary artery disease, hypertension, and high cholesterol. (Exs. 824, 833, 846; Tr. 1486:3–24.) Earl also had a prior fracture to his right hip. (Exs. 228, 891.)

On October 30, 2013, the Decedent was admitted for inpatient care at the Transitional Living Center ("TLC") at the VAMC. (Ex. 833.) Earl had previously been diagnosed with left hemiparesis, which means weakness of the left side. (Tr. 8:13–22.) This condition resulted from the stroke. (*Id.*) At the VAMC, Earl's primary physician was Dr. Zelenak. Dr. Zelenak noted that the assessment showed that Earl was not expected to be able to live independently and staff suggested that the family look for a nursing home. (Ex. 833 at 2.) The family insisted that Earl remain at the VAMC and asked for an exception. (Tr. 1684:17–1685:4; 1688:13–1689:3.) Dr. Zelenak also discussed with both Kurt and Mark the risks of pain medication due to Earl's previous cerebrovascular accident. They accepted the risks and side effects in favor of Earl's comfort. (Ex. 846 at 2.) Earl was requesting pain medication due to chronic right hip pain and the pain to his left hip from his recent fall. (Ex. 832.)

On or around October 31, 2013, Dr. Zelenak discussed Earl's neurological condition with Mark. Dr. Zelenak recommended consultations with neurology (Ex. 847 at 3; 855) and a "Surgery Vascular Outpatient" consultation to address the October 2013 cerebrovascular event (Ex. 859 at 2; Tr. 1706:19–1707:6). Dr. Zelenak also issued orders for a brain MRI (Tr. 1707:12–1708:10) and a "Carotid Doppler." (Tr. 1708:15–1709:9; Ex. 860 at 2.) He also made a note about fall precautions and ordered Earl to have a low bed. (Ex. 833 at 4.)

On November 12, 2013, Mark and Kurt met with Earl's care plan team and addressed Earl's care. Notably, the record indicates that Earl was to be transferred using a sling for all transfers and that Earl was not to be left unattended by staff while he was toileting. (Ex. 895.) Earl was to receive physical and occupational therapy to improve his activities of daily living while at the

TLC.  (Ex. 897 at 6.)  The long term goals included that Earl would accept limitations of his disease and accept a nursing home placement as a permanent home and that he would maintain or increase his physical level of activity.  (*Id.* at 7.)

On December 10, Mark informed VA staff that he and Kurt preferred to assist Earl in toileting if they were present.  (Ex. 927 at 3.)  The care plan was updated to state that staff will assist Earl with toileting but allow family members to assist when they are present.  (*Id.*)  Earl had another fall on December 12 when Earl was sitting in his wheelchair and either reaching for a cup of water, the urinal, or attempting to stand.  (Ex. 929 at 2.)  Earl could not recall exactly what he was doing and the fall was not witnessed.  (*Id.*; Tr. 197:16–24.)  Due to Earl's memory deficit, he was not a reliable historian.  (Ex. 929 at 2.)  Dr. Zelenak ordered the use of a bed and wheelchair alarm.  (*Id.*)

On December 12, Michael Kintz, a nurse at the TLC noted that Earl scored as a high risk for falls on the Morse Fall Scale.  (Ex. 933 at 5.)  The record further indicated that Earl's gait was impaired and he would overestimate or forget his limitations.  (*Id.* at 6; Tr. 495:3–10.)  The record shows that staff was to implement fall prevention interventions with patients such as educating patients to request assistance in activities like toileting, placing the bed in the low position, locking wheels on bed and wheelchair, and placing articles within easy reach.  (Ex. 933 at 5.)  According to Mr. Kintz, he and the care team tried to implement the fall precaution interventions with Earl. (Tr. 497:6–13.)  Earl was moved to a different room to be closer to the nurse's station for safety. (Tr. 323:6–13.)  In early January, another Morse rating was performed and recorded by Mr. Kintz. The record shows that the rating included Earl's previous two falls in October and December.  (Ex. 964.)  It included the prior fall prevention interventions that were in the December 12 note.  It added that staff should complete surveillance rounds every two hours.  The Morse rating further

added a fall prevention intervention relating to gait and transferring problems which stated that there should be assistance with mobility by using an "alarm as [a] reminder to call for assistance." (*Id.* at 2.) On December 31, Mark requested that the alarm be turned off because the family members frequently assisted Earl with toileting and the alarm was annoying. (Ex. 961.) The alarm was disconnected but it was then reconnected on January 9 to comply with orders signed by Dr. Zelenak. (*Id.*)

On January 3, staff reminded Kurt and Earl that Earl was only admitted for short stay rehabilitation and the therapists had determined that the goals had been met and that they needed to find a permanent placement for Earl. (Ex. 967.) Earl had been accepted into two facilities; however, Kurt and Earl did not want to leave the TLC and insisted that he remain. (*Id.*) Later that day, Mark and Kurt met with Dr. Khan. After that meeting, it was determined that Earl could remain at TLC until the family identified an alternative facility that the family found agreeable. (*Id.* at 2.)

On January 10, 2014, Dr. Zelenak ordered continued use of the bed and wheelchair alarms. (Ex. 977.) Dr. Zelenak met with Mark regarding restorative care. Dr. Zelenak continued to advise that caution be used because Earl was at a high risk of falling. (*Id.*) Earl had two wheelchairs, an Invacare brand manual wheelchair ("Invacare") and an Iris Quickie Tilt In Space ("Tilt In Space") manual wheelchair. The medical records indicate that Earl's wheelchairs were equipped with the alarms on February 10 and 11. (Exs. 1001, 1010, 1014.) However, Mr. Kintz could not remember if they were so equipped on the evening of the fall. (Tr. 526:24–527:14.) He did remember that the alarm was not going off that evening.

The records indicate that Earl wanted to get better; however, Earl clearly had limitations with respect to his left side. In order to toilet, Earl would have to stand up from his wheelchair,

5

pivot to the toilet, and then sit.  The same procedure is used to get up from the toilet.  This is commonly referred to as a stand-pivot transfer in the medical records.  (Ex. 237.)  On December 4, for example, Regina Ketterman assisted Earl in using the toilet.  The record stated that she provided moderate assistance to Earl when he stood and maximum assistance for the pivot maneuver.  Moderate assistance means that staff would have to make 50% of the effort for the task.  (Tr. 937:12–22.)   Earl then needed maximum assistance to pivot to get back in his wheelchair.  Maximum assistance means that the staff member provides 75% of the assistance with the task.  (Tr. 438:12–14.)  On December 10, the care plan indicated that Earl needed moderate assistance with transfers. (Ex. 927 at 2.)

On December 31, Earl was able to stand with minimum assistance while using a grab bar, stand independently while doffing pants, pivot and maintain control while lowering himself to the toilet.  (Ex. 961.)  On January 10, he wheeled himself to the occupation therapy gym by using his right hand and taking "small steps with both feet."  (Ex. 976.)  The note states that he needed minimum assistance to stand, could pull himself up with a vertical grab bar, and stand for brief periods for toileting.  (*Id.*)  On January 28, he performed a stand-pivot transfer with moderate to minimal assistance throughout and continued to require moderate assistance with toileting.  (Ex. 988.)  The medical records indicate that Earl "requires moderate assistance to transition to/from sit to standing."  (*Id.* at 2.)  On January 31, he transferred from his wheelchair to the toilet while using the grab bar and contact guard assistance of a staff member.  (Ex. 995.)  Contact guard assistance means keeping your hands on the patient to help him maintain his balance and keep him vertical.  (Tr. 937:22–938:5.)  The January 31 note further states that Earl required moderate assistance for clothing management and that he was dependent for toilet hygiene.  (Ex. 995.)

A February 3 progress note stated that Earl has a pincher grip with his left hand, could move his left arm at the shoulder and wrist, and could lift his left leg off of the ground. (Ex. 1007.) On or around February 7, 2014, TLC staff stated in the medical records that Earl would "require gait belt, hands on assistance, and 2 people – 1 to assist patient and another to follow closely with chair." (*Id.*) Earl had walked in the hall with the assistance of staff the prior evening but his performance was "very inconsistent." (*Id.*) On February 10, Darlene Chiavetta, an occupational therapist, conducted a therapy session with Earl. (Ex. 250.) Her note reflects that Earl needs maximum assistance to pull down his pants and that he can complete toileting with minimum assistance. Further, with respect to patient goals, although Earl had a goal of completing toileting tasks and transfers with minimum assistance, Ms. Chiavetta noted that the goal was unmet. (*Id.* at 2.) On February 11, prior to his fall, he walked in the hallway with a walker and assistance from staff. (Ex. 1015 at 3.) That note also states that Earl "can't use L[eft] arm, it's flaccid. Has to be assisted with most ADLs [activities of daily living] and all transfers or he would fall." (*Id.*)

The Decedent fell in his bathroom on February 11 around 8:30 p.m. Mr. Kintz wrote the note concerning the fall at approximately 9:00 p.m. on February 11, 2014. (Ex. 1016.) The note states that Earl reported that he fell when he was trying to get into his wheelchair after using the toilet and he fell and hit his head against the wall. (*Id.* at 4.) Earl was found lying on the floor with a laceration on the left side of his head behind his ear. Earl's shoes were on, his pants were pulled down, and the wheelchair[2] was beside Earl with his head at the sink and his legs by the toilet. (*Id.* at 5.) The emergency room note states that Earl fell to his left side from the toilet while

---

[2] The record does not reflect which wheelchair was in the bathroom with Earl at the time of his fall. However, given that Earl indicated on February 10 that he did not want to use his new Tilt In Space wheelchair, it is more likely that he was utilizing the Invacare wheelchair on February 11 when he fell. (Ex. 250.)

attempting to self-transfer back to his wheelchair. (Ex. 96.) The note further indicates that his left arm was "flaccid." (*Id.*)

Mr. Kintz' report notes that the corrective actions to be taken after this incident include the wheelchair alarm to be on and Earl not to be left alone while on the toilet. (Ex. 1016 at 7.) Mr. Kintz testified that these corrective actions did "not necessarily" mean that a TLC staff member helped Earl to the toilet and left him there. (Tr. 527:18–528:15, 531:2–25.) He testified that none of the staff at the TLC said that they assisted Earl on the toilet and left him. (Tr. 435:7–14.) However, Mr. Kintz further testified that someone might have helped Earl get to the toilet or he could have gotten there himself. (*Id.* at 435:25–436:6.) Mr. Kintz also testified that he did not believe that Earl could have pulled his pants down himself. (Tr. 438:19–20.) There was no evidence that any family members or other visitors were with Earl at or around the time of his fall.

Further, Mr. Kintz testified that the wheelchair alarm was not going off when he was in the room. However, he did not know if the wheelchair alarm was activated and he does not remember if Earl's wheelchairs were even equipped with an alarm. (Tr. 526:24–527:14.)

As a result of the fall, Earl fractured his left hip. Dr. Simmons' note stated that Earl complained of severe hip pain and also documented a small contusion on his head. (Ex. 1015.) The record further reflects that Earl has "persistent [left] hemiparesis," had been bearing weight on his left leg with assistance but that his left arm "remains flaccid" from his October 2013 CVA. (*Id.* at 3.) On February 12, a fall assessment was performed. (Ex. 138.) That record indicates that Earl was self-transferring from the toilet to his wheelchair when he fell from the toilet. (*Id.*)

On February 14, he underwent a hip hemi-arthroplasty to repair his hip. On February 17, Earl reported that his pain was a six on a ten point scale. His pain was reported as controlled. (Ex. 1081.) On February 19, his pain was adequately controlled. (Ex. 1091.) On February 21, he rated

8

his pain as one. (Ex. 1098.) In late February, his pain was much better. (Ex. 1115.) Earl was still not ambulating and "wanted to know if he would every [sic] walk again." (*Id.*) Earl was prescribed opiate pain medication to help with his pain due to the fracture and surgery. (Tr. 1113:22–1114:10.) In March 2014, VA staff approached Mark and Kurt about transferring Earl to the hospice unit but the family did not want Earl to transfer to the hospice unit. (Tr. 1281:14–1282:8.)

Family members observed Earl to be in significant pain due to his hip fracture. (Tr. 1270:25–1271:18.) Earl also lost independence after the hip fracture. (Tr. 1276:12–15.) Between April and August, Earl was essentially confined to his wheelchair in his room and then in his bed. (Tr. 1367:5–25.) Kurt observed that Earl could not do certain activities to the level that he could do prior to the fall. (Tr. 1277:13–1278:16.) Dr. Knight opined that Earl suffered more than minimal discomfort due to the hip repair until he died in August. (Tr. 1144:2–12.)

Based on the evidence, the court finds that Earl suffered pain but it was manageable with the medication. The court further finds that Earl had other ailments that contributed to his pain that were not a result of the fall. Earl's mobility also declined as a result of the hip fracture and Earl required more assistance to complete activities of daily living.

Earl was transferred to hospice care at the VAMC on August 12 and died on August 17, 2014. (Tr. 1282:17–21.)

### **Expert Testimony**

This case was tried based on competing expert opinions about what occurred in the bathroom when Earl fell. These opinions were based on the experts' experience, education, and their review of the medical evidence in the case. Plaintiff's experts opined that an unknown TLC staff member assisted Earl to the bathroom and then left him on the toilet unsupervised. Defendant's experts opined that Earl had the physical capability to get to the bathroom himself

and then he fell off the toilet while attempting to either get onto the toilet or get back on to his wheelchair after using the toilet.  The court now sets forth the testimony that was material to the findings and will address the credibility and persuasiveness of the experts' opinions.

Plaintiff offered the testimony of Dr. Denis Knight and Patricia Quigley, RN.  Dr. Knight has decades of experience in overseeing nursing homes and also has a primary care practice.  Ms. Quigley is a nurse with decades of experience in fall prevention.  Both of these experts opined that Earl was not capable of standing up from his wheelchair, pulling down his pants and pull ups, pivoting to the toilet, and then sitting down on the toilet without assistance from the nursing staff. The court finds that both experts were qualified to offer opinions on these issues.  Dr. Knight and Ms. Quigley based their opinions on Earl's flaccid left arm, weak left leg, and other physical limitations.  Their opinions are also based on the medical records that show that Earl required maximum assistance to take down his pants and at least minimum to moderate assistance to perform the stand-pivot transfer.  (Tr. 793:14–794:2, 804:20–805:18, 820:25–821:22 (Quigley); 1095:7–20, 1098:17–1099:21, 1101:15–18 (Knight)).  Dr. Knight also testified that Earl could not have locked the wheelchair or moved the wheelchair foot rests in order to stand up; rather, he would have fallen forward while trying to do so.  (Tr. 1101:3–18.)

Further, given the position that Earl was found in, they opined that he fell towards his left side from the toilet because of his weak left leg and his flaccid left arm.  (Tr. 790:8–792:21 (Quigley); Tr. 1099:6–21 (Knight)).  If he had fallen while trying to get onto the toilet, he would have fallen forward like he had on previous occasions and his head would have been in a different position.  (Tr. 1100:11–1101:22.)  As a result, they both opined that Earl was assisted to the bathroom by TLC staff who left him unattended.  Dr. Knight opined that Earl suffered a fractured

10

hip from the fall and further opined that he had pain and suffering as a result of the fracture and related surgical repair.

With respect to the chair alarm, the experts testified that the standard of care was for the TLC staff to utilize the chair alarm as ordered by Dr. Zelenak.  (Tr. 829:21–830:3)  If the alarm had been on his wheelchair and activated, it would have sounded when he attempted to get out of the wheelchair.  (Tr. 1104:25–1105:6, 1106:1–11.)  Ms. Quigley opined that she believed that the alarm was present on the wheelchair but was not on at the time of the fall and that the staff had a duty to make sure that it was on.  (Tr. 835:5–8.)  Ms. Quigley's opinions are based on the records which show that the alarm was present on the wheelchair.  Based on the records and opinions, if the alarm was documented as being present and if it was activated, then this would suggest that whoever assisted Earl to the toilet disabled the alarm prior to transferring Earl.

Defendant's experts were Dr. Brangman and Connie Cheren, RN.  Ms. Cheren has more than 40 years' experience in fall prevention and has developed a system for facilities to implement in order to develop care plans to prevent falls.  (Tr. 1724:4–1725:2.)  She offered opinions regarding fall prevention, and opinions that Earl had a desire to be independent, and that the therapists were working with him on how to manipulate his wheelchair.  (Tr. 1889:6–16.)  She also offered an opinion that the standard of care was not breached with respect to a June aspiration event.  (Tr. 1892:11–1893:10.)

Dr. Brangman offered opinions on whether Earl had the ability to transfer to the toilet on the evening of February 11.  Dr. Brangman agreed that the standard of care required staff at the TLC to provide assistance with toileting and remain with Earl during his toileting if a staff member was aware that Earl needed to use the toilet.  (Tr. 1600:21–1601:16.)  Dr. Brangman opined that Earl got to the bathroom on his own on February 11 and that Earl had enough mobility and function

on his right side to stand up, take his pants down, and get on the toilet. (Tr. 1506:21–1507:6.) Dr. Brangman opined that Earl was able to perform these tasks because he had enough knowledge on how to propel himself with his wheelchair and knowledge of the wheelchair parts to maneuver them. (Tr. 1507:7–19.) Earl then fell when he was on the toilet and he essentially overestimated his ability. (*Id.*) Dr. Brangman recognized that in the past Earl had always had minimum to moderate assistance to complete this task and that this was why he could not fully complete it on February 11. (Tr. 1506:21–1507:6.) Dr. Brangman admitted that she did not recall if Earl had ever been found on the toilet by himself while he was at the TLC and testified that it would not have a bearing on her opinion if he had never successfully transferred to the toilet without assistance from staff. (Tr. 1597:17–1598:3.) In forming her opinions, Dr. Brangman relied on the medical records and her experience that patients overestimate their abilities.

With respect to the wheelchair alarm, Dr. Brangman testified that she did not know if the wheelchair alarm was operational or not and did not know if it was removed or turned off. (Tr. 1621:20–1622:1.) She further opined that a wheelchair alarm does not prevent a fall. (Tr. 1622:20–25.)

### Courts' factual findings as to Expert Testimony and Earl's Fall

After review, the court finds the testimony of Dr. Knight and Ms. Quigley to be credible and their opinions persuasive. The court finds that Earl might have had the capability to propel himself to the bathroom in his wheelchair on February 11, 2014. However, Earl did not have the physical capability to perform a stand-pivot transfer from the wheelchair to the toilet and to remove his pants and pull ups while standing. The court bases this factual finding on the testimony of Plaintiff's experts, the treating providers, and the medical records. It is clear from the records that Earl had not previously performed a stand-pivot transfer, removed his pants and pull ups, and sat

on the toilet without assistance while he was at the TLC.  Rather, he required some level of assistance to perform all of these tasks.  Notably, the day prior to the fall, he required moderate assistance to remove his clothing to use the toilet.  Further, given his left-sided hemiparesis, Earl could not use his left hand to perform any physical tasks.  He also was very weak in his left leg.  As a result, he needed assistance in standing and remaining upright in order to perform the stand-pivot transfer.  Earl would not have had the ability due to his weak left leg and flaccid left arm to stand up from his wheelchair, take down his pants and pullups, and then pivot to the toilet.

The court does not find persuasive Dr. Brangman's opinion that Earl was capable of doing these actions himself because the evidence does not support this conclusion.  The record is completely devoid of any evidence that Earl ever performed these actions without any assistance from staff.  While Dr. Brangman offered testimony that he could perform these tasks because he was aware of the steps he needed to take and he had done parts of these tasks with minimal assistance, such an opinion is not persuasive in light of the significant evidence that Earl needed at least minimum assistance to do most of the physical actions required to use the bathroom.  The most significant is the physical ability to remove his clothing, and to do so while standing up without assistance on a very weak left leg and using only one arm.  Therefore, the court finds by a preponderance of the evidence that a TLC staff member assisted Earl to the toilet and then left him unattended and Earl fell.  Although the identity of the TLC staff member is unknown, this does not prevent the court from making the factual determination that it was a staff member who assisted Earl to the bathroom and left him unattended.  There was no evidence that Earl had a visitor on the evening of February 11 in his room and Earl could not perform the actions to get his pants down and get himself on the toilet from his wheelchair.

13

The court further finds that the wheelchair alarm was present on the wheelchair but not activated on February 11. The records indicate that the alarms were turned off in December but then they were ordered to be used in compliance with Dr. Zelenak's orders on January 10. The alarms were present on Earl's wheelchairs according to the medical records. The standard of care required the alarms to be active and in use. As a result, the court finds that the unknown staff member who assisted Earl to the bathroom deactivated the alarm prior to transferring Earl to the toilet. Because the alarm was present on the wheelchair as documented in the records and ordered by Dr. Zelenak, the unknown staff member would have deactivated the alarm prior to the transfer as it was clear that the alarm was not sounding when Earl was discovered by staff members after his fall.

## II.    Conclusions of Law

Plaintiff has brought a Kansas state law claim against the United States. Under the FTCA, sovereign immunity is waived for certain state law tort claims against the United States. *See* 28 U.S.C. § 1346(b)(1); *Garling v. United States Env't Prot. Agency*, 849 F.3d 1289, 1294 (10th Cir. 2017). Kansas state law governs the estate's survival claim. *Garling,* 849 F.3d at 1294 ("State substantive law applies to suits brought against the United States under the FTCA."); *see* K.S.A. § 60–1801.

Plaintiff asserts that Defendant was negligent because a staff member failed to assist Earl while he was toileting on February 11, Defendant failed to take certain safety precautions to prevent falls, and failed to prevent an aspiration event. To establish negligence, Plaintiff must show that the United States "owed [the Decedent] a duty of care and [was] required to meet or exceed a certain standard of care to protect [him] from injury; ... breached this duty or deviated from the applicable standard of care; and [he] was injured and [his] injury proximately resulted

from [this] breach of the standard of care." *Esposito v. United States*, 165 F. App'x 671, 675 (10th Cir. 2006) (quoting *Nold ex rel. Nold v. Binyon*, 272 Kan. 87, 31 P.3d 274, 285 (2001)).  Under Kansas law, "[t]he standard of medical or hospital care which is to be applied in any given case is not a rule of law, but a matter to be established by the testimony of competent medical experts." *Nold*, 31 P.3d at 285.

Here, all experts agreed that the standard of care required TLC staff to assist Earl while he was toileting and remain with him.  Based on the court's findings of facts, the court finds that this standard of care was breached when an unknown TLC staff member left Earl by himself on the toilet.  The court further finds that the failure to have an employee remain with Earl while he was toileting was the proximate cause of his injuries and that it is more likely than not that his fall would have been prevented if the TLC staff member remained in the bathroom while Earl was toileting.  Earl's injuries included a fractured hip, the necessary surgery, and related pain and suffering as a result.  Earl also suffered by having a loss of his mobility and independence.  The evidence, however, shows that Earl was already experiencing decreased mobility and left-sided hemiparesis due to the stroke.  Further, Earl had many other conditions that contributed to his pain.  Notably, the record is clear that Earl had chronic pain and was taking pain medication prior to the fall.

Kansas law provides that the court may award non-economic damages for pain and suffering, disability, disfigurement, and any accompanying mental anguish.  K.S.A. § 60-249a.  Plaintiff seeks damages in the amount of $4,699,800 for Earl's noneconomic losses.  (Doc. 478 at 37.)  In support, Plaintiff cites to awards in "other, comparable FTCA survival action cases."  (*Id.* at 40.)  The cases cited by Plaintiff are not comparable.  First, Plaintiff cites to *Doe D.P. v. United States*, No. 16-2267 (D. Kan. 2021).  That case involved repeated and improper touching of an

15

inmate's genitals during several medical appointments. (*Id.*, Doc. 161.) Plaintiff also cites to *Holcombe v. United States*, 584 F. Supp. 3d 225 (W.D. Tx. 2022). That case involved a mass shooting at a church. Finally, Plaintiff cites to *Wheat v. United States*, 630 F. Supp. 699 (W. D. Tx. 1986). That case involved medical negligence of a physician in failing to inform the decedent that she had cervical cancer on more than two dozen occasions. None of these cases involve similar allegations of negligence. Rather, they are quite shocking.

Defendant has pointed to cases with similar allegations of negligence. (Doc. 481 at 35.) The most similar case, *Littlefield v. United States*, involved negligence when a nurse failed to properly assist the plaintiff while walking down a hallway. No. 4:19-CV-00027-LPR, 2020 WL 6552306, at *10 (E.D. Ark. Nov. 6, 2020). Similar to Earl, the plaintiff fell and broke his hip. The plaintiff also had other ongoing medical issues at the time. The court awarded damages of $72,000 for pain and suffering, which represented an award of approximately $12,000 per year. *Id.*

Here, the court finds that an award of $60,000 is appropriate for the Decedent's noneconomic damages, specifically his pain and suffering. The court declines to award any damages for disability and disfigurement. This award reflects the fact that Earl suffered pain immediately after the fall, had to undergo surgery to repair his hip, and had to take increased pain medication while recovering. Earl's pain did lessen after he had recovered from the surgery; however, the award also reflects the decrease in Earl's mobility as a result of the hip injury. As discussed herein, Earl was already suffering in pain and had limited mobility due to other medical issues; therefore, it is somewhat difficult to determine how much the fall and related hip fracture added to his pain and limited mobility. The court finds that $60,000 is an appropriate amount for the impact the fall and fracture had on his pain and mobility in the last six months of his life.

16

Defendant has also asserted that the Decedent and his family are at fault for the negligence and asks the court to reduce the damages by the percentage of fault.  (Doc. 469 at 39–40.)  While Defendant raised three arguments as to comparative fault, the only applicable argument based on the findings of the court is that the Decedent and his family refused to transfer Earl to a nursing home in December 2013.  (*Id.* at 40.)  The court does not find that the Decedent and his family's conduct in requesting that Earl stay at the TLC contributed to the negligence.  Had such a request been inappropriate, Defendant should have refused to accommodate the request.  Therefore, the court finds Defendant 100 percent at fault and responsible for the damages award set forth herein.

Because the court has determined that Defendant was negligent because a staff member failed to stay with Earl while toileting, the court declines to specifically address the remaining allegations of negligence.[3]

## III.    Judgment

Judgment is entered in favor of Plaintiff and against Defendant on the estate's survival claim.  Plaintiff is awarded damages in the amount of $60,000.

IT IS SO ORDERED.  Dated this 24th day of March 2026.

__ s/ John Broomes_____
JOHN W. BROOMES
CHIEF UNITED STATES DISTRICT JUDGE

---

[3] With respect to failing to take certain preventative actions for falls, the court finds that Plaintiff has not proven that these actions proximately caused Earl's injuries.  Neither of Plaintiff's experts testified that the presence of a wheelchair alarm would have prevented Earl's fall.  Dr. Knight testified that it would have loudly sounded if it went off, but he did not testify that the alarm would have prevented the fall.  Ms. Quigley testified that an alarm would have scared Earl and "once people start to fall, gravity takes over." (Tr. 850:13–851:3.)  In any event, the court has already determined that the most likely explanation to be gleaned from the evidence is that an unidentified TLC staff member disabled the alarm when assisting Earl to the toilet shortly before his fall.  With respect to the aspiration event, the court finds that Plaintiff has not established a breach in the duty of care.  Even if the court were to determine that Defendant was negligent in some other way as argued by Plaintiff in his proposed findings, the court would not find any additional damages in favor of Plaintiff.